Paul J. DONOHOE, Plaintiff,

v.

The Honorable Charles L. BURD, Defendant.

No. C–1–86–1156.

United States District Court, S.D. Ohio, W.D.

Aug. 30, 1989.

Robert F. Laufman, Cincinnati, Ohio, for plaintiff.

Douglas C. Prince, Cincinnati, Ohio, Andrew J. Ruzicho, Columbus, Ohio, for defendant.

## ORDER

HERMAN J. WEBER, District Judge.

This matter is before the Court upon its merits after a trial to the Court. Plaintiff claims damages for malicious prosecution and abuse of process under Ohio law. This Court has diversity jurisdiction. On the basis of the evidence, testimony and arguments presented by the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

In 1981, plaintiff Paul J. Donohoe ("Donohoe"), who is presently a resident of Florida, was a citizen of West Virginia employed as a bank officer with First National Bank of Huntington in West Virginia; prior to that, plaintiff served in the United States Air Force for 21 years attaining the rank of Colonel. Defendant Charles Burd ("Burd") is and was a citizen of Ohio engaged in the private practice of law in Lawrence County, Ohio.

In the early fall of 1981, Burd was retained as legal counsel for Markin Tool and Mfg. Corp. ("Markin Tool"), an Ohio corporation owned by Steven D. Markin ("Markin"). Burd's time and advice were sought regarding the obtaining of financing for Markin Tool. It was during the course of searching for new financing that Burd and Markin were introduced to Donohoe who, with Zafar Iqbal ("Iqbal"), expressed an interest in investing in Markin Tool.

Markin Tool machined parts for the gas and oil industry and like many others, in 1981, was suffering a serious cash problem. The Company needed funds to pay for a computer controlled lathe which had been delivered in August, 1981 and was being used for production. This machine was responsible for 60% of the Company's production. In October, 1981, the seller of the lathe demanded payment and by November, 1981, the seller was threatening to repossess the machine. The loss of this machine would have been disastrous to the Company, therefore, immediate funding was necessary to pay for the machine.

Burd had contacted a number of banks but none were willing to loan money to Markin Tool. In October, 1981, Burd contacted Marshall Reynolds ("Reynolds"), a West Virginia financier, who indicated an interest in investing in the Company. Reynolds sent Iqbal and Donohoe to evaluate the Company and later suggested that he (Reynolds), Iqbal, Donohoe and Burd invest in the Company. Reynolds later withdrew and the investors were to be Iqbal, Donohoe, Burd and Markin.

In November, 1981, Burd was elected Judge of the Lawrence County Municipal Court, a part-time judicial position which he continues to serve.

On November 17, 1981, these investors met and elected the officers of the corporation: Markin—President, Iqbal—Vice President, Donohoe—Treasurer, and Burd—Secretary. At this meeting, Markin agreed to sell to Markin Tool 75 shares of his stock at $10.00 per share for a total of $750.00. It was intended that the investors would then buy these shares from the Company providing it with operating cash. Donohoe and Iqbal each executed subscriptions for 25 shares of stock in Markin Tool for $1,000 per share. Donohoe and Iqbal each borrowed $25,000 from the First Bank of Ceredo to purchase their shares in Markin Tool. No subscription was executed by Burd.

Also during this November 17, 1981 meeting, Donohoe requested that Burd accompany Markin to the First Bank of Ceredo in West Virginia and submit to the Bank personal guaranties and financial statements which were required by the Bank to process a loan to Markin Tool.

The Ceredo Bank agreed to loan Markin Tool $136,000 of the $151,400 needed to pay for the lathe if all the investors, including Burd and Donohoe, personally guaranteed the loan. Both Markin and Donohoe were involved in negotiating this loan, and it was agreed and understood between Donohoe and Burd that Burd had not committed himself to purchase shares in Markin Tool and that any personal guaranty and financial statement submitted by Burd to the First Bank of Ceredo would be contingent upon Burd becoming an equity owner in Markin Tool. Burd failed to make this contingency clear to the bank.

On or about November 20, 1981, Burd and Markin drove together to the Ceredo Bank in West Virginia; Donohoe was out of town on other business. Burd and Markin met with Larry Stark ("Stark"), Vice President of Loans for the bank. Burd and Markin presented their financial statements which were date-stamped November 20, 1981 and Burd and Markin signed blank personal loan guaranties dated November 20, 1981 in favor of the Ceredo Bank.

On November 20, 1981, the First Bank of Ceredo issued loan proceeds on behalf of Markin Tool pursuant to a Time Note payable on demand for $136,000 signed by Markin as President of Markin Tool; Markin also signed, in the same capacity, a Security Agreement. Markin then received a check dated November 20, 1981 payable to the Tooling and Machine Sales of Virginia, Inc. in the amount of $151,400; the difference between the Note and the check was made up by withdrawal from the Markin Tool account. Burd and Markin then left the bank and returned to Ohio together.

This loan process was expedited so that the lathe seller would not repossess the lathe. At the November 20, 1981 closing, Stark explained to Burd and Markin the effect of their guaranties and explained that because of the emergency, a Time Note would be used which would be rolled over into an installment note by the parties

at a later time. Stark testified that it was his usual practice to turn over the check when the Time Note was signed.

William McGuire, a representative of the lathe seller, signed a receipt which indicated that the lathe was paid in full on November 20, 1981. McGuire's signature also appears on the reverse side of the check which was deposited on the next banking day, Monday, November 23, 1981.

On Saturday, November 21, 1981 during a meeting of the Markin Tool officers, Burd expressed his refusal to agree to a SBA loan and indicated that he wanted to stabilize the debt. Burd also expressed concern about his guaranty, but testified that he did not object to the loan from the Ceredo Bank. Donohoe had gone to Washington, was not present at the closing of the loan on November 20, 1981 and did not return until November 30, 1981.

On December 2, 1981, Markin, as President of Markin Tool, executed a promissory note in the amount of $136,000 and a new security agreement to replace the documents signed on November 20, 1981. No new funds were disbursed at this time as this was a continuation of the original November 20, 1981 loan transaction. The Security Agreement signed by Markin indicated that Burd remained a guarantor of this loan. Neither Donohoe nor Markin removed Burd's guaranty from the bank as the bank assumed and relied upon the fact that Burd remained a guarantor.

On or about this same period of time, Burd personally contacted the bank loan officer of the Ceredo Bank and advised the bank of his decision not to become an equity owner of Markin Tool.

In late December or January, 1982, Burd notified the other investors that he was not going to invest in the Company. Donohoe then borrowed another $25,000 and on January 19, 1982, Donohoe subscribed to the 25 shares previously intended for Burd.

On December 3, 1981, Burd submitted a bill for professional services rendered to Markin Tool and on January 20, 1982, Burd and Markin Tool entered into a retainer agreement for Burd's legal services. Burd and Markin Tool had previously agreed that any fee for legal services would be waived if Burd became a shareholder.

Burd's fees for services previously performed in 1981 in seeking financing before Donohoe became involved totaled $15,000. No breakdown of the fee was given. Markin Tool paid Burd $5,000 and Donohoe and Markin signed a promissory note on behalf of Markin Tool agreeing to pay Burd $10,-000 for his previous services. Donohoe personally guaranteed this note.

In a letter dated January 21, 1982, Stark wrote on behalf of the First Bank of Ceredo to Burd regarding his personal guaranty on the loan; this letter explained that Burd's personal guaranty would not be returned as it was considered collateral for the November 20, 1981 loan from the bank to Markin Tool.

Upon learning of the bank's use of his guaranty, Burd prepared and presented to Donohoe, Markin and Iqbal a hold-harmless agreement which was designed to protect Burd from any liability to the bank. This agreement was signed on February 17, 1982 by all shareholders, including Donohoe, individually and as representatives of Markin Tool.

On June 17, 1983, Donohoe purchased the 25% ownership interest of Iqbal making Donohoe a 75% owner in Markin Tool. Later, in early 1984, Donohoe became the sole owner of Markin Tool when he acquired the remaining shares owned by Markin.

During the period of 1982 through 1985, the Ceredo Bank continued to keep Burd informed as to the status of the loan. In February, 1983, Markin Tool began to fall behind in payments. From that time through the summer of 1985, the loan from the Ceredo Bank was in arrears and letters from the bank to Donohoe, Markin, Iqbal and Burd regarding the delinquent status of the loan were circulated.

On February 25, 1983, Burd met with Philip Pitkin, Executive Vice President for the Ceredo Bank, and on March 7, 1983, Burd had two telephone conversations with Pitkin. These were the only meeting and telephone calls between Burd and Pitkin. On both occasions, Burd claimed he had a

hold-harmless agreement and wanted to be released as a guarantor. Pitkin made it clear at that point that the loan was based on his guaranty, that the bank was not a party to the hold-harmless agreement, and that it was holding Burd liable. Burd did nothing further regarding his guaranty until he prepared a second hold-harmless agreement in August, 1984 which Donohoe signed individually and as President of Markin Tool. The major difference between the two hold-harmless agreements was the addition in the second agreement of the phrase referring to the loan as "said loan being signed on 11/20/81."

In February, 1982, the investors borrowed $340,000 to buy two additional lathes which Donohoe personally guaranteed. By 1983, Markin Tool was experiencing financial difficulties and began to fall behind on the loan payments. At this point, Donohoe had guaranteed almost $500,000 of Markin Tool loans, and during 1982 to 1985, in addition to his $150,000 investment, Donohoe loaned approximately $302,000 of his own money to Markin Tool to keep the Company afloat and signed additional guaranties in an attempt to save the Company.

Burd represented Markin Tool during all this time until mid-July, 1985, during which time Donohoe, the majority shareholder, and Burd, the Company's lawyer, had frequent meetings and telephone conversations. At no time did Burd complain of any impropriety on the part of Donohoe.

In July, 1985, the Ceredo Bank sued all four guarantors. On July 10, 1985, Burd was served with Summons and a Complaint filed by the First Bank of Ceredo in the Circuit Court of Wayne County, West Virginia requesting judgment on his personal guaranty for the loan made to Markin Tool on November 20, 1981.

Upon receipt of this Summons and Complaint, Burd resigned his legal representation of Markin Tool and retained counsel to defend him in the suit filed by the First Bank of Ceredo. Through counsel, Burd settled the claim against him for $17,500 and was dismissed with prejudice from the suit on October 21, 1985. The Ceredo Bank retained the security interest in the lathe and continued its lawsuit against the other guarantors.

Burd demanded Donohoe hold him harmless under their hold-harmless agreements but Donohoe was financially unable to pay the $17,500, or otherwise satisfy the bank. Donohoe at all times admitted he owed this obligation to Burd.

On October 30, 1985, Donohoe executed a voluntary petition seeking protection for Markin Tool in Chapter 11 of the Bankruptcy Code, which was filed in the United States Bankruptcy Court for the Southern District of Ohio on November 6, 1985.

On October 31, 1985, Burd, unaware of Donohoe's intention to place Markin Tool in bankruptcy, filed a civil suit in the Lawrence County Court of Common Pleas against Donohoe and Markin Tool to enforce the hold-harmless agreements of February 17, 1982 and August 6, 1984 as well as a claim for emotional distress; the suit was amended November 6, 1985 to include a claim on account for past due attorney's fees. Burd made no claim that his guaranty had been improperly obtained or used by Donohoe. Rather, Burd alleged that although Donohoe had assured him that he would be held harmless, Donohoe told the Ceredo Bank not to release Burd, which was not the fact. This claim was listed on Markin Tool's bankruptcy petition as a $118,000 unsecured claim without priority. Burd's civil suit against Markin Tool and Donohoe was stayed and remained unprosecuted as a result of the bankruptcy.

Just prior to these events in October, in September of 1985, Donohoe was charged with violations of Ohio Rev.Code § 2913.11 for passing bad checks, a fourth degree felony. Donohoe was arrested, appeared before Burd, waived preliminary hearing, bound over to the grand jury, and released on his own recognizance.

Donohoe was subsequently indicted on these charges and paid the dishonored checks. The charges were then dismissed on December 11, 1985.

In mid-December, 1985, subsequent to the dismissal of the bad check charges

against Donohoe, Burd had an informal luncheon with the Lawrence County Prosecutor, Richard Meyers, concerning matters of court procedures within the Lawrence County Municipal Court and Donohoe's name was mentioned with reference to the bad check charges and the fact that when confronted with a criminal prosecution Donohoe would pay off his debts. Prosecutor Meyers justified to Burd the dismissal of the criminal charges for the reason that Donohoe had paid the dishonored checks.

Upon learning this, Burd described his experiences with Donohoe, Markin Tool and the First Bank of Ceredo. Burd said that Donohoe "ripped me off" and that Donohoe should have been "burnt." Burd inquired about the possibility of filing criminal charges on this matter and the prosecutor advised Burd that Donohoe's actions might constitute a violation of the Ohio Criminal Code and agreed to investigate the matter to determine whether a criminal violation had been committed. Prosecutor Meyers asked Burd to write up everything he knew about the situation and to give him a statement.

Based upon the statement provided by Burd and upon his investigation, the prosecutor advised Burd that Donohoe's activities constituted a violation of Ohio Rev. Code § 2913.02. The prosecutor then suggested to Burd that a criminal complaint be sworn against Donohoe.

Burd's statement to the prosecutor claimed that his guaranty to the Ceredo Bank was contingent on his becoming a stockholder in Markin Tool; that on November 20, 1981, Stark and Pitkin at the Ceredo Bank "assured me that unless I decided to become a shareholder, I would have no personal liability on this and that they would release me from guaranty." At trial, the bank officers denied that Burd's guaranty was contingent, rather they emphasized that they placed a great deal of reliance on Burd's guaranty and stated the loan would not have been made had Burd not signed a guaranty.

Burd claimed in his statement to the prosecutor that he was undecided whether to become a shareholder when he signed his guaranty. The evidence preponderates, however, that Burd was still considering whether to invest in the Company on November 20, 1981 when he signed his guaranty at the bank. It was not until later that Burd communicated his decision to reject the investment to the other investors.

Burd claimed in his statement that he informed the First Bank of Ceredo of his decision to reject the investment and asked the bank to release his guaranty as promised. The Ceredo Bank, however, had released the entire proceeds of the loan on November 20, 1981 in reliance upon Burd's guaranty and the bank advised Burd that the money had been paid out and he was committed. Burd claims that he wrote a letter withdrawing his guaranty within seven to 10 days after November 20, 1981, however, he had no copy of this alleged letter and the bank files contained no such letter. These bank files otherwise appear complete.

In his statement to the prosecutor, Burd said:

> Not only did Donohoe deceive me into signing the guaranty with the express promise that I would not be liable unless I became a shareholder, but he also promised that if I did, it was only six months obligation and the credit could not be extended. Thus, his extending the credit and payoff on this loan over a period of several years which was well beyond the expressed or implied use of my guaranty.

Even if this is true, it is clear that it was Markin who signed the papers in this regard. At the time Burd signed the guaranty, he was an attorney earning $100,000 a year and was representing Markin Tool in obtaining loans with several banks; he was experienced, he knew that his guaranty created obligations between him and the bank and not between him and Donohoe. He knew at the time the hold-harmless agreements were signed by Donohoe in 1982 and 1984, long before he made his statement to the prosecutor, that Donohoe could not obtain the release of his guaranty from the bank. That is why he drafted

hold-harmless agreements. Burd knew the period of the loan and that it was in default at the time the second hold-harmless agreement was signed.

Burd failed to provide the prosecutor with a copy of his civil complaint filed to collect the same debt. Burd failed to disclose to the prosecutor that he made no allegation of any improprieties in his civil complaint of which he now accused Donohoe in his statement.

The only witnesses interviewed by the prosecutor and the only witnesses who testified at the preliminary hearing were Burd and Markin; their testimony is inconsistent with the testimony of the other trial witnesses and with the trial exhibits.

The substantial weight of the evidence preponderates that Burd decided to reject the investment sometime early in January, 1982. Burd served as corporate secretary from his election on November 17, 1981 until he was replaced on January 28, 1982 by Doretha Johnson. The SBA loan application, which is date-stamped December 31, 1981 and January 5, 1981 (presumed to be 1982), is signed by Burd as the corporate secretary and shows Donohoe as a 25% owner of the Company; the revised SBA application signed by Doretha Johnson (post-January 28, 1982) shows Donohoe as a 50% owner of the Company. Donohoe's Statement of Personal History, dated December 21, 1981, shows that he only held a 25% ownership of the Company. Donohoe's subscription to purchase the shares reserved for Burd is dated January 19, 1982. The earliest document indicating any intention by Burd to reject the investment is his bill for legal services to Markin Tool dated December 3, 1981.

Burd's reaction to the Stark letter confirming his status as a guarantor dated January 21, 1982 was simply to obtain the hold-harmless agreement from the other investors. At the time of the first hold-harmless agreement, Burd knew the terms of the loan with the Ceredo Bank. Burd knew he was bound to the bank on his guaranty at this time—long before his statement to the prosecutor and his execution of a criminal complaint against Donohoe charging a violation of Ohio Rev.Code § 2913.02, a third degree felony for grand theft dated January 17, 1986, alleging that Donohoe exceeded the "express and implied" conditions of his guaranty.

Prosecutor Meyers testified that ordinarily a criminal complaint is signed by police officer, however, in this case, Burd personally signed the complaint, his clerk of courts prepared the arrest warrant, he requested that "we filed (sic) criminal charges" and the prosecutor concurred. Burd was present in Prosecutor Meyer's law office when Markin gave his taped statement on January 16, 1986, one day after Burd's statement dated January 15, 1986. On the day of the preliminary hearing, Donohoe saw Markin going into Burd's law office. Burd sat at counsel table with the prosecutor at this hearing and it was Burd, not the prosecutor, who notified Markin to appear before the grand jury.

After execution of the criminal complaint against Donohoe, Donohoe was arrested on January 20, 1986, held in jail for two nights, he retained a lawyer, and was released on bond within 48 hours of his arrest.

Donohoe did not see the statements given by Burd or Markin until the fourth day at his attorney's office.

On February 27, 1986, a preliminary hearing on the criminal charges filed against Donohoe was held before the Ironton Municipal Court. Burd testified at this hearing and stated:

So they had come (sic) guaranty forms there and they (Stark and the bank) asked us to sign those. Mr. Marcum (sic) signed it and I explained to them that I was not a stockholder in the company and I didn't want to be obligated to pay the debt unless I did become a stockholder in the company. They said they understood that because I had already had a meeting with Paul Donohoe about that and that was understood and apparently he had discussed this with them. So they asked me as a convenience to sign it then and they would not hold me liable for anything if I decided not to become a stockholder.

The evidence preponderates to the contrary. Stark and Pitkin both testified that the loan was contingent on Burd's guaranty, and the bank looked to Burd as a guarantor. This is later confirmed by the fact that when Burd definitely decided to reject the investment and knew he could not gain the release of his guaranty, he entered into the hold-harmless agreements with the other investors.

Criminal charges against Donohoe were presented to the Grand Jury of Lawrence County, Ohio who heard testimony of Burd, Markin, Iqbal, Pitkin and Stark. An indictment was returned charging Donohoe with a violation of Ohio Rev.Code § 2913.02, a third degree felony for grand theft.

After Donohoe was arrested, Burd told Prosecutor Meyers that he did not want to see Donohoe go to jail, but that he just wanted his $17,500. Burd's only interest and reason for initiating the criminal proceeding against Donohoe was to enforce the hold-harmless agreements he had with Donohoe as it was made clear that Burd wanted to be made whole and if he was paid all charges would be dismissed against Donohoe.

Donohoe was advised by his lawyer that Burd's version of the facts could lead to a conviction and a prison term.

As Donohoe was unable to raise the $17,-500, his daughter mortgaged her home and sent a certified check in the amount of $17,500 to Donohoe's attorney, Jim Collier, Jr. On June 26, 1986, Collier personally delivered the check to Burd at the courthouse and the criminal charge against Donohoe was immediately dismissed with prejudice.

In this same summer, Donohoe filed for personal bankruptcy; the Markin Tool and Manufacturing Corp. no longer exists.

Donohoe has always acknowledged his obligation to Burd on the hold-harmless agreements. Donohoe did attempt to obtain Burd's release from the guaranty. Donohoe's efforts are confirmed by Pitkin's letter to Donohoe, which was copied to Burd, returning the hold-harmless agreement.

Donohoe was arrested at Markin Tool in the presence of his employees, was handcuffed and taken to the Ironton jail. At the jail he was fingerprinted, searched, his clothes were taken, and he was put into prison garb.

Donohoe remained in jail for two days without information as to why he had been arrested. His only information was the Complaint which had been signed by Burd and which alleged that he had committed grand theft on December 2, 1981. His attorney visited him the second day and told Donohoe that he was still trying to find out from the prosecutor exactly what the charges were and that they could not set bail until they knew the charges. Donohoe spent two nights in jail and during this time, he was unable to learn the true nature of the charge, and when or if bail would be set.

Donohoe was put in a jail cell with eight to 10 other prisoners. His bed consisted of a flat metal piece of steel with no mattress and he was supplied with a blanket but no pillow. He was unable to sleep the first night and had only little sleep the second night.

His wife visited him the second day but he was only able to communicate with her through a small hole in a solid steel door. He was angered that his wife was subjected to the demeaning ordeal of visiting him in jail. He was frustrated by his helplessness and inability to do anything about it.

As to his damages, Donohoe claims as follows:

Prior to his arrest, Donohoe had been involved in civic affairs and organizations, enjoying a full social life. Since his arrest, he testified that he has engaged in no civic activities and has had no social life.

Following his experience, he claims to have altered his life style dramatically. When he worked at Markin Tool, his wife brought food to him because he feared to go into town to eat. He also insisted that his wife never travel alone when she came into Ohio to visit him at the Company; any time she came to Ohio, she was to call before leaving and upon arrival; when in

Ohio, Donohoe would report to his wife before leaving one location and again upon arrival at his destination. When at Markin Tool, he would pull his car into the plant so no one would know that he was there and when visiting his attorney, he made arrangements to go in the back door.

After Donohoe moved to Florida, he gave his home address and telephone number to only two members of his family, but not his mother, and his children had to write to him through a post-office box number.

While the trial proceedings were conducted, Donohoe was afraid to stay in Cincinnati and instead stayed in a Kentucky hotel and asked his witness, Dr. Sprehe, to stay at a Kentucky hotel.

Donohoe attributes this behavior to his fear of Burd's power and influence in Ohio and to his fear that he would again be arrested and jailed for no reason.

A number of events have caused Donohoe to relive the events of this arrest and jailing. A visit by a police car to Donohoe's apartment complex in Florida caused him to obtain names of attorneys because he feared Burd might "get to him" in Florida; a fake "arrest" by the Cancer Society caused him to panic and break out in a sweat. Donohoe also suffers from recurrent dreams related to Burd and his felony theft arrest.

Dr. Sprehe, Donohoe's treating psychiatrist, has diagnosed Donohoe as suffering from chronic Post–Traumatic Stress Disorder (PSTD) with accompanying major depression. Dr. Sprehe attributed the PSTD to Donohoe's felony theft arrest, and explained that Donohoe has been obsessed by the terror and outrage of that situation.

Significantly, Dr. Sprehe testified that Donohoe failed to include in his history Donohoe's experience in military service in Vietnam and Korea which included exposure to murders and hangings; Dr. Sprehe opined that Donohoe's symptoms resemble those which result from war neurosis and that PSTD syndrome is common in those with war service.

Dr. Sprehe stated that he has diagnosed this PSTD syndrome in approximately 200 patients of the thousands he has treated, and of those 200, only one patient suffered PSTD as a result of a humiliating experience with the police and an erroneous arrest.

Dr. Sprehe also explained that he did not see or treat Donohoe regularly; Dr. Sprehe first saw Donohoe five days *after* this lawsuit was filed and then *three* more times over the next 13 months. It is Dr. Sprehe's expert opinion that if treatment had continued regularly, Donohoe's condition would have improved instead of worsened, and he testified that he believed Donohoe did not want and was not receptive to receiving necessary treatment.

Dr. Sprehe acknowledged that Donohoe's depression could be attributed to the distress involved in the failing of the business and his $400,000 debt, and to the stress and anxiety related to his lawsuit against Burd; but it is Dr. Sprehe's opinion that these events were not traumatic and not the reasons for the syndrome.

Dr. Sprehe maintained, however, that Donohoe can still be cured of these symptoms and estimated that treatment would require two years of weekly one-hour sessions at $125 an hour. Dr. Sprehe testified that without the recommended treatment, the symptoms would continue and affect Donohoe's ability to work and relate to other people. Dr. Sprehe also testified that suicide was a possibility if treatment was not continued.

Donohoe had legal expenses of $5,250 for his criminal defense and psychiatric expenses of $855 to the date of trial.

## CONCLUSIONS OF LAW

### A. *Plaintiff's Claims—Generally*

Malicious prosecution and abuse of process are state torts involving a misuse of the legal process.

■ Malicious prosecution is the filing of either a criminal or civil proceeding against another without probable cause and with malice. To establish the tort of malicious prosecution, a plaintiff must prove the following elements: 1) the malicious institu-

tion of a prior proceeding against the plaintiff by the defendant; 2) the lack of probable cause for the filing of that prior suit; 3) the termination of that prior proceeding in the plaintiff's favor; 4) the seizure of the plaintiff's person or property during the course of the prior proceeding; and 5) injury or damages suffered by plaintiff as a result. *Crawford v. Euclid National Bank*, 19 Ohio St.3d 135, 483 N.E.2d 1168 (1985).

Probable cause exists when a defendant had a reasonable ground of belief, supported by trustworthy information and circumstances known to the defendant which would be sufficiently strong to cause a reasonably careful person, under similar circumstances, to believe that the prior proceedings and method of presenting the action were reasonable and lawful. *Melanowski v. Judy*, 102 Ohio St. 153, 156, 131 N.E. 360 (1921), citing *Ash v. Marlow*, 20 Ohio 119 (1951); see also *Epling v. Pacific Intermountain Express Co.*, 55 Ohio App.2d 59, 379 N.E.2d 239 (1977).

A person has probable cause to believe and act if a reasonable person would have so believed and acted. *Id.*

■ The return of an indictment by the grand jury is evidence of probable cause; when an indictment has been returned by the grand jury, the plaintiff has the burden of producing substantial evidence to establish lack of probable cause. *Adamson v. The May Co.*, 8 Ohio App.3d 266, 268, 456 N.E.2d 1212 (1982); *Epling*, 55 Ohio App.2d at 62, 379 N.E.2d 239; see also *Hruska v. Severance Speciality, Inc.*, 498 F.2d 796, 802 (6th Cir.1974). Plaintiff must produce evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular. *Adamson*, 8 Ohio App.3d at 268–69, 456 N.E.2d 1212. In determining lack of probable cause, the defendant's conduct should be analyzed in view of his situation and the facts and circumstances which he knew or was reasonably chargeable with knowing at the time he made the original complaint. *Melanowski*, 102 Ohio St. at 156, 131 N.E. 360.

If the defendant had probable cause to believe that plaintiff committed the crime as charged in the complaint, the signing of that complaint by the defendant is lawful, even though it may later be discovered that the plaintiff did not commit the crime or that the resulting proceedings were unjust and improper. *Id.*

■ Abuse of process is a state tort defined as the employment of legal process for some purpose other than that which it was intended by law to effect. *Clermont Environmental Reclamation Co. v. Hancock*, 16 Ohio App.3d 9, 474 N.E.2d 357 (1984). See *Jennings v. Shuman*, 567 F.2d 1213, 1218 (3d Cir.1977). In other words, abuse of process is the use of legal process for an ulterior purpose; the invalidity or validity of the *issuance* of process is immaterial; it is the ulterior or improper purpose for which the process is used which is the basis for the cause of action.

To establish the tort of abuse of process, a plaintiff must prove the following elements: 1) the defendant used legal process for an ulterior purpose; 2) the defendant intentionally or willfully committed some further act in the use of the process which was not proper in the regular conduct of the initiated proceeding and 3) the plaintiff was directly injured or damaged by the wrongful use of process for the ulterior purpose. *Clermont Environmental Reclamation*, 16 Ohio App.3d at 11, 474 N.E.2d 357.

Abuse of process does not lie for the wrongful bringing of an action, but does lie for the perversion or "abuse" of the process after the issuance. *Id.*

■ The significant distinction between these two causes of action is the point at which malice becomes involved in the prior proceeding. See *Jennings*, 567 F.2d at 1218. If a defendant maliciously caused process to issue without probable cause, the plaintiff will have a claim sounding of malicious prosecution. If a defendant had probable cause to have process issued and later misuses that process, the plaintiff will have a claim sounding of abuse of process.

A claim for abuse of process may also arise when a defendant misuses any process which was illegitimately issued. Abuse of process occurs when one perverts the original process for some purpose outside the scope of its legal limits. Thus, malicious prosecution lies when one has malice in initiating a suit and malice is present *before* process issues; abuse of process lies when one misuses the process and injects malice *after* the process issues.

A second point of distinction between these two causes of action lies in the justification and the use of process. See *Jennings*, 567 F.2d at 1218–19. The issuance and use of process can be either legitimate or illegitimate. In establishing a cause of action for abuse of process, whether the initial institution of the prior proceedings was legitimate or illegitimate is not relevant. When process is used legitimately or justifiably and that process is later put to an improper use, an element of a claim for abuse of process has been established. If process is issued illegitimately or unjustifiably but is properly used within the limits of that initial writ, an element of a claim for malicious prosecution is established but not an element of a claim for abuse of process, as the use to which the writ was put is the purpose for which that process was intended. On the other hand, if the initial process is unjustified and that process is later used in an improper fashion, an element of both malicious prosecution and abuse of process has been established.

### B. Plaintiff's Claim for Malicious Prosecution

1. The first element—malicious institution of a prior proceeding against plaintiff by defendant.

Defendant admits filing a criminal complaint charging plaintiff with grand theft. As to the "malicious" element, the Ohio Supreme Court in *Melanowski*, held:

> In actions for malicious prosecution, while malice is an essential element, the want of probable cause is the real gist of the action. If want of probable cause be proven, the legal inference may be drawn

that the proceedings were actuated by malice.

*Melanowski*, 102 Ohio St. at 155, 131 N.E. 360; see also *Skarbinski v. Henry H. Krause Co.*, 378 F.2d 656 (6th Cir.1967).

Malice is an attitude or state of mind that makes a person knowingly do an act for an improper or wrongful purpose. It includes a wrongful act, intentionally done and without probable cause. It also includes an intent to annoy or injure another, although ill will or personal hostility are not required. *Skarbinski*, 378 F.2d at 658.

Malice may, but need not be, inferred from the absence or lack of probable cause, but a bare showing of malice will not, in turn, permit an inference of lack of probable cause. The existence of malice is determined from all the facts and circumstances in the evidence. *Melanowski*, 102 Ohio St. at 155–156, 131 N.E. 360; *Detling v. Chockley*, 70 Ohio St.2d 134, 436 N.E.2d 208 (1982).

More than four years elapsed between the use of Burd's guaranty and Burd's complaint to the prosecutor alleging its improper use by Donohoe. At the time of his complaint, Burd knew of Markin Tool's bankruptcy and knew that Donohoe got money to pay off bad checks when faced with criminal prosecution. Burd also knew that Donohoe had strong reasons to file for personal bankruptcy. Burd knew that the bankruptcy of Donohoe and Markin Tool would cause him to lose all chances of recouping his unsecured claim for $180,000. Burd knew his only chance to recoup was to resort to the criminal prosecution of Donohoe which he instituted to collect a dischargeable debt from Donohoe which Donohoe was unable to pay.

Burd's signing of the criminal complaint against Donohoe for the purpose of collecting an otherwise uncollectable personal debt satisfies the first element of plaintiff's claim for malicious prosecution—the malicious institution of a prior proceeding against plaintiff by defendant.

2. The second element—lack of probable cause for the filing of the prior suit.

■ Evidence that plaintiff was bound over to the grand jury and was indicted by the grand jury creates a rebuttable presumption of probable cause. The return of an indictment does not, however, conclusively establish probable cause. *Epling*, 55 Ohio App.2d at 62, 379 N.E.2d 239; see also *Adamson*, 8 Ohio App.3d at 269, 456 N.E.2d 1212. In *Adamson*, the Court held:

> A contrary rule would change the elements of this action and exclude recovery in any case where there has been a bind-over order or an indictment, regardless of its fanciful or unfounded source. The ability to rebut probable cause presumed from an indictment is particularly significant, since the grand jury's evidence is usually secret and beyond the plaintiff's reach. If the probable cause presumption were not rebuttable, a truly malicious accusor could lie at the preliminary hearing or the grand jury sessions and thereby obtain a bind-over order or an indictment which screened him from civil liability for his malicious prosecution.

*Adamson*, 8 Ohio App.3d at 269, 456 N.E.2d 1212.

Burd's complaint to the prosecutor and subsequent testimony was to the effect that Donohoe, with the requisite criminal intent and culpability, used Burd's guaranty beyond the authority given to Donohoe by Burd. The undisputed evidence establishes that it was Burd, himself, who gave his guaranty to the Ceredo Bank on the same day the loan was closed on November 20, 1981. When Burd signed his guaranty, the money was paid out on the loan. The evidence preponderates that at this point, Burd's guaranty was required by the bank to secure the loan and Burd knew he was committed as a guarantor; that the transaction on December 2, 1981 was not a second loan as no other funds were paid out on December 2, 1981; but that the December 2, 1981 transaction was a completion of the paperwork of the November 20, 1981 loan.

On December 2, 1981, Burd was still considering his status as an investor. The earliest time by which anyone could possibly know that Burd was *not* going to be an investor was his bill for legal services dated December 3, 1981, *after* the bank used his personal guaranty to pay out the loan proceeds on November 20, 1981. Burd's use of the hold-harmless agreements with the other investors makes it clear that he knew the bank would not release his guaranty as the bank was not a party to the hold-harmless agreements, and he knew the bank would look to him as a guarantor until the money disbursed on November 20, 1981 was re-paid; the *bank*, not Donohoe, considered that Burd was a guarantor on this loan and the *bank*, not Donohoe, was the only party with the authority to release Burd from his personal guaranty. Burd knew and understood this. The fact that Burd drafted two hold-harmless agreements substantiates the extent of his knowledge and understanding of the situation.

At the time Burd signed the complaint and made the statement, Burd had been a practicing attorney for 10 years and a Judge for four years. As a judge, Burd was frequently required to make probable cause determinations under Ohio Rev.Code § 2913.02 and actually made probable cause determinations on cases prosecuted by Prosecutor Meyers and his assistants.

A private person giving information to a public official or prosecutor of which that official is ignorant, in the malicious prosecution context, does not cause the initiation of the proceedings if it is left to the official's uncontrolled discretion to initiate the prosecution. *Archer v. Cachat*, 165 Ohio St. 286, 135 N.E.2d 404 (1956). If, however, the information is known by the private person to be false, an intelligent exercise of the prosecutor's discretion becomes impossible. The private person is responsible for the initiation of criminal proceedings if his expressed direction, request or pressure of any kind was the determining factor in the prosecutor's decision to commence the prosecution or the information furnished by him upon which the prosecu-

tor acted was known to the private person to be false. *Id.*

■ In addition, the attorney giving the advice must have been impartial and disinterested in order for the advice to serve as a defense and there must be good faith in seeking the advice. *Conant v. Johnson,* 1 Ohio App.2d 133, 136, 204 N.E.2d 100 (1964), citing *Ash,* 20 Ohio 119. The advice of counsel cannot be used as a subterfuge to shield a defendant from liability for the institution of an entirely groundless suit and cannot be a defense if the defendant obtained the advice for the mere purpose of protection.

■ Advice of a lawyer is a complete defense to an action for malicious prosecution if the defendant made a full, fair and complete disclosure to the lawyer of all the material facts of which the defendant had knowledge, necessary to obtain accurate legal advice, and tending to prove or disprove the criminal charge, and if the criminal case was filed thereafter in reliance and in good faith on the advice of that lawyer. *Killilea v. Sears, Roebuck & Co.,* 27 Ohio App.3d 163, 168, 499 N.E.2d 1291 (1985); *Reenan v. Klein,* 3 Ohio App.3d 142, 444 N.E.2d 63 (1981); *Bacon v. Patera,* 772 F.2d 259 (6th Cir.1985).

Burd failed to disclose accurately all of the facts to the prosecuting attorney, particularly that his purpose was to collect a personal debt from Donohoe. Thus, he is not entitled to the defense that he acted in reliance on the advice of the prosecuting attorney. Rather, the evidence preponderates that Burd instituted the criminal proceeding without probable cause. The second element of plaintiff's claim for malicious prosecution—the lack of probable cause for the filing of the prior suit is satisfied.

3. The third element—termination of the prior proceeding in plaintiff's favor.

■ The general rule is that settlement and compromise defeats a malicious prosecution action. When the settlement and compromise involves a payment of money by a plaintiff to the defendant, how-

ever, the trier of fact must determine whether the payment was a full compromise and settlement and voluntarily made as such. See *Curls v. Lenox Garage Co.,* 68 Ohio App. 285, 40 N.E.2d 213 (1941). This exception articulates sound reasoning as a person who uses the threat of the criminal process to extort money should not be able to use the fact that the extortion was successful to defeat a claim for malicious prosecution.

The reasoning behind the general rule, however, that settlement and compromise *defeats* an action for malicious prosecution, is especially significant. It is important to recognize the primacy of the third element of malicious prosecution—termination of the prior proceeding in plaintiff's favor.

It is important to understand that restitution is a legitimate and purposeful end of the criminal justice system. If a party, such as this plaintiff, decides, with advice of competent counsel acting in his best interest, that it is more beneficial or less troublesome to forego what he perceives to be an impropriety and to pay restitution rather than to rely on the judicial process to decide the issue, then that is that plaintiff's choice and right. He cannot, however, then proceed as if the error or proceedings had been finally determined in his favor.

By the settlement this plaintiff has deprived the judicial branch of government of the opportunity to examine and resolve issues or errors in his case. This settlement has denied the judicial system, from the municipal court, common pleas court, state court of appeals, state supreme court, federal court, federal court of appeals to the United States Supreme Court, the opportunity to justly determine the prior proceedings and to decide and resolve any improprieties. Here, the parties, by settlement, not the courts, fixed the nature and terms of the determination of the prior proceedings.

■ Donohoe had 21 years of experience in the United States Air Force, retired as a Colonel, had wartime experiences, and witnessed murders and hangings. He lived

in Korea and Vietnam. As a civilian, he was a successful banker and businessman. He had been arrested before this incident and had entered into a settlement and compromise which resulted in the dismissal of the criminal charges pending against him after he paid off his bad checks.

While Donohoe had been arrested by a deputy named Burd and spent 48 hours in jail waiting for bond to be set, he knew the nature of the charge against him and was represented by a competent lawyer. Donohoe entered into the settlement and paid the $17,500 on the advice of his lawyer. The charges were dismissed. Donohoe was aware of all his legal rights at the time he entered into the settlement and the charges were dismissed. The Court concludes that the payment of $17,500 to Burd by Donohoe's daughter on her father's behalf and the resultant dismissal of the charges was a voluntary compromise and, therefore, finds that the prior criminal proceedings were not terminated in favor of plaintiff. Under the particular facts of this case, this Court concludes that plaintiff has not met his burden of proof on the third element of his malicous prosecution claim—that the prior suit was terminated in his favor. Therefore, plaintiff's cause of action for malicious prosecution is dismissed on its merits.

### C. Plaintiff's Claim of Abuse of Process

1. The first element—use of the legal process by defendant for an ulterior purpose.

■ It is a well recognized principle that the use of criminal process in the court system in an effort to collect a civil debt will support an action for abuse of process. *Restatement of Torts Second* § 682; 27 A.L.R.3d 1202, Use of Criminal Process to Collect Debt as Abuse of Process, Section 3.

A criminal prosecution is intended to bring a person who has committed a crime to justice and not to aid in the collection of a civil debt; therefore, an arrest with the objective of forcing payment of money is a perversion of the objective intended by the law. See, 27 A.L.R.3d 1202, § 3; see also 1 Am.Jur.2d, Abuse of Process, §§ 14–15.

Burd, as an attorney, should be especially aware of the Code of Ethics which governs his profession and the significant concerns of the legal system as set out in EC 7–21:

> The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system.

Burd personally guaranteed a bank loan which cost him $17,500 on default. Thereafter, Burd sued Donohoe and Markin Tool on two hold-harmless agreements. When he demanded payment from Donohoe, Donohoe did not deny owing the money but could not pay. When Donohoe notified the creditors of Markin Tool and filed Chapter 11 bankruptcy, Burd was one of the creditors listed and Burd's civil suit against Donohoe was stayed. Burd then filed criminal charges against Donohoe to collect the $17,500 debt that was otherwise uncollectible. Significantly, Burd did not file criminal charges against Markin who actually used and benefited from Burd's guaranty and who also signed as a co-guarantor on the loan and as a party to Burd's hold-harmless agreements. Plaintiff has proven the first element of his claim for abuse of process—that defendant used the legal process for an ulterior purpose.

2. The second element—intentional further improper acts by defendant in the use of the process.

After the process was issued, Burd made it clear to the prosecutor and to Donohoe

and his attorney that he did not want to see Donohoe go to jail, but that Burd only wanted to recover the $17,500 debt from him. Thereafter, with the knowledge that Donohoe had paid to dismiss previous criminal charges, and with the belief that Donohoe would do the same, Burd refused to accept time payments and insisted on full payment in exchange for dismissal of the charges. Significantly, Burd did not take this course of action against Markin or Iqbal. Further, he failed to inform the prosecutor of the nature of the civil suit he had filed against Donohoe which was stayed due to Donohoe's bankruptcy proceedings. Plaintiff has proven the second element of his claim for abuse of process— that defendant intentionally and willfully committed further improper acts *after* the criminal proceedings were instituted.

*D. Damages*

■ Plaintiff is entitled to the amount of money which will reasonably compensate him for the actual damages he sustained as a proximate result of the abuse of process; in determining these compensatory damages, the Court may consider plaintiff's mental and/or physical suffering, if any, loss of earnings and expense, medical expense, embarrassment, humiliation, and loss of personal property or freedom. Plaintiff may only recover those damages which naturally resulted from the defendant's wrongful acts and this Court cannot consider remote, indefinite or speculative injuries or damages.

■ Based upon the foregoing, this Court finds that plaintiff is entitled to $5,250 for his expenses in defending himself against the felony theft charge and finds that plaintiff suffered nominal compensatory damages from the abuse of process in the amount of $1,000.00. The Court rejects the opinion of Dr. Sprehe because plaintiff failed to supply significant relevant history to this medical expert and did not contact the doctor until after this suit was filed. Further, Donohoe has not followed the doctor's advice of getting regular treatment and only saw the doctor three times over the 13 month period following his initial visit.

■ The Court finds that the injury and damage claimed by plaintiff to be a direct and proximate result of defendant's wrongful acts have been exaggerated and do not extend to the degree necessary for future psychiatric care. The Court finds that a reasonable person could and would have recovered from the trauma of these events upon his release from jail and that, under these particular circumstances, plaintiff's emotional instability cannot, with any amount of certainty or probability, be attributable to the defendant's wrongful acts. Plaintiff had been arrested previously and, while the nature of the one known arrest is distinguishable from the grand theft arrest, plaintiff's experience in that regard must be considered. Further, the Court also considers plaintiff's experience during his military service in Vietnam and Korea to be significant with regard to his emotional state. It is more probable than not that his claimed emotional stress injuries resulted from his financial problems, loss of business and war experiences rather than any act of Burd.

The Court concludes that the total amount of actual compensatory damages to which Donohoe is entitled to recover from Burd is $6,250.00.

■ As to the issue of punitive damages, the Ohio Supreme Court has stated in the syllabus in *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987) that actual malice is necessary for an award of punitive damages:

> Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. (emphasis in original).

*Id.* at syllabus paragraph 1.

Further, the syllabus in *Davis v. Tunison*, 168 Ohio St. 471, 155 N.E.2d 904 (1959) states that:

Actual malice may be inferred from conduct and surrounding circumstances, such as malicious prosecution of one wantonly, recklessly and without justification, but there must be evidence from which such malice can reasonably be inferred to justify punitive in addition to compensatory damages.

*Id.* at syllabus paragraph 2.

The Ohio Appellate Court in *Curls* specifically addressed the propriety and reasoning behind punitive damages in actions for malicious prosecution:

> The [trier of fact] might well believe, under the evidence, that there was insufficient investigation and that the arrest was to accomplish a private end, not connected with the public good. If the [trier of fact] so believed, it would be sufficient to indicate malice in the prosecution and, therefore, punitive damages would be recoverable.

*Curls*, 68 Ohio App. at 288, 40 N.E.2d 213.

 Based upon the foregoing Findings of Fact and Conclusions of Law, the Court finds that the facts in this case justify an award of punitive damages under the applicable Ohio law. While punitive damages are generally justified when one commits malicious prosecution, such should not always be the case when one commits abuse of process. In this case, however, defendant's abuse of the legal process involved a conscious disregard for the rights and safety of the plaintiff when defendant was aware that his acts had a great probability of causing substantial harm to plaintiff. For one who is a sworn officer of the courts as an attorney to abuse the criminal process for the purpose of collecting a private debt is especially shocking and outrageous.

Punitive damages are an exception to the general rule of compensation for injury, and may be awarded as punishment and to discourage the commission of similar acts. The amount of punitive damages must be fair and reasonable under all the facts and circumstances of the case and cannot be excessive or actuated by passion or prejudice.

Accordingly, upon consideration of the facts and circumstances of this case, the Court finds that justice requires that punitive damages in the amount of $18,000.00 be assessed against defendant Burd.

### E. Conclusion

Based upon the foregoing, judgment is hereby entered in favor of plaintiff Paul J. Donohoe and against the defendant Charles L. Burd and plaintiff is awarded $6,250.00 plus reasonable attorneys fees for actual compensatory damages, and $18,000.00 punitive damages for a total amount of $24,250.00 plus interest from the date of judgment, reasonable attorneys fees and costs. The Clerk of Courts is DIRECTED to enter final judgment herein accordingly.

IT IS SO ORDERED.