OPINION
Superior Beverage Company, Inc. ("SBC") and Curtis Reed ("Reed") appeal from the judgment of the Trumbull County Court of Common Pleas. Appellee, Joseph Bellino ("Bellino"), filed suit, alleging the tort of malicious prosecution. A jury returned a verdict in favor of Bellino, awarding $8,125 in compensatory damages and $150,000 in punitive damages. Both Reed and SBC filed motions for judgment notwithstanding the verdict pursuant to Civ.R. 50. SBC also, in the alternative, filed a motion for a new trial pursuant to Civ.R. 59. The motions were denied, and SBC filed the instant appeal. Reed also appeals.
Bellino was a member of the Teamsters Union. He worked for SBC. The Teamsters went on strike. During the strike, Reed, who was a replacement worker, was severely beaten while helping make a delivery for SBC. As a result of that incident, Bellino was charged with felonious assault. Subsequently, the Trumbull County Prosecutor filed a nolle prosequi
motion, which the trial court granted. The charge against Bellino was dismissed. Bellino filed suit for malicious prosecution, naming SBC, Reed, John Antonucci, Personnel Support Systems, Inc., Commissioned Security, Inc., and Robert Gander as defendants. Prior to the trial, by agreement of counsel, all named parties except for Reed and SBC were dismissed from the lawsuit.
SBC is a distributor of beer and wine located in Austintown, Ohio. It delivered its product to its customers by means of delivery trucks. Its truck drivers were members of the Teamsters Union. The Teamsters went on strike. In order to avoid a shutdown of its business, SBC contracted with Personnel Support Systems, Inc. ("PSS"), a corporation based in Cincinnati, for the provision of drivers and laborers to maintain its operations. PSS specialized in providing replacement workers to companies during strike situations. PSS supplied and paid approximately forty drivers for SBC during the strike. PSS participated in, if not controlled, the management of the replacement workers. SBC also contracted with Commissioned Security, Inc., for the provision of security personnel during the strike.
During the strike, the Teamsters picketed in front of SBC's location in Austintown. Additionally, some of the members would follow the delivery trucks on the routes. Generally, the Teamsters would ignore the drivers, but speak to the retailers in an attempt to dissuade them from purchasing product from SBC during the strike. However, some harassment, intimidation and, at least in this case, violence was directed at the replacement workers while making deliveries.
Reed, a resident of Louisiana, was an employee of PSS who arrived in the area on June 1, 1995, to work at SBC. He was assaulted on June 6th. In the assault, he suffered multiple facial fractures, his eye was knocked out of its socket, his nose was broken in two places, and his jaw was broken. Twenty-three screws and five steel plates have been surgically installed in his face. His vision in one eye has been permanently damaged.
On June 6th, Reed was sent on a delivery route with Paul Jones, another PSS employee from out of state. Jones was the driver of the truck. Reed was sent along to provide security for Jones and the truck, and to help unload the product at customer locations. They arrived at a store in Warren, Ohio, to make a delivery. They parked the truck in back of the store at the delivery door. When the door was not opened, Jones walked around to the front of the store. When Reed noticed the back door of the store open, Reed exited the truck on the passenger side and walked around the back of the truck. As he turned the corner on the driver's side of the truck, he saw five men approaching. Reed testified that he saw his assailant for between five and ten seconds before he was hit. However, Reed was not looking directly at his assailant when he was hit, rather he had turned and was facing the side, or the back, of the truck at the time the first blow landed.
Jones was returning from the front of the store as the five men were closing in on the vehicle. He walked around the to the driver's side of the vehicle and, appreciating the situation, tried to open the driver's door to get in the truck. Before he could get the door open, a man shoved him into the door and threatened to kill him. This man was identified and convicted of menacing. Jones testified he then saw Reed get hit in the side of the head and fall down. Jones saw the assailant. As the man who threatened him began to swing at him, Jones ducked under his arm and ran into the store. Jones testified that he saw Reed get hit at least three times before Jones escaped. Once in the store, Jones called the police.
Jones spoke to the police at the store and answered the questions he was asked. He did not know the names of the assailants. Upon learning of the incident, two employees of Commissioned Security, Inc. came to the store. One, Robert Gander, rode with Jones on his next deliveries. After Jones completed his deliveries, he returned to SBC. Upon returning to SBC, Jones saw Bellino standing on the picket line and was sure he was the person who assaulted Reed. Jones told Walter Kohowski, SBC's Vice-President of Operations, that the man he saw standing on the picket line was the one who assaulted Reed.
SBC had photocopies of all of its regular employees' driver's licenses. The clarity of these photocopied pictures varied dramatically and, in some cases, the quality was very poor. Jones was asked to look at these pictures and attempt to identify all five of the men at the scene. He was only able to positively identify two of the men, one being the man who threatened to kill him, the other being Bellino, whom he saw on the picket line, and who, he thought, was the person that assaulted Reed.
While he was in the hospital, Reed was interviewed by Officer Calloway and, later, by Detective Sines, both of the Warren Police Department. Reed told Detective Sines that he knew his assailants, in the sense that he saw them and knew they were employees of SBC, but did not know their names. Apparently, as part of the security procedure, the replacement workers viewed videotape of the picket line each day in order to familiarize themselves with the striking Teamsters, presumably so they might recognize them away from SBC's location. Detective Sines advised him to look at SBC's pictures of its employees when he got out of the hospital. When Reed looked at SBC's photocopied pictures, he identified Bellino as the person who assaulted him.On the day the assault occurred, Robert Gander, of Commissioned Security, Inc., returned to SBC after having ridden with Jones on deliveries after the assault. Gander stood out near the picket line and attempted to listen to the strikers' conversations. He claimed that he heard Bellino regaling his fellow Teamsters with his story of beating up Reed, bragging about doing it. Gander testified to that effect at Bellino's preliminary hearing.
After Reed was released from the hospital, he went to the Warren City Prosecutor's Office with Clifford Nuckols, a manager and consultant who also worked for PSS. At this point in time, Reed's jaw was wired shut and he was unable to speak. They met with Prosecutor Bluedorn. Nuckols explained the situation to Bluedorn. They brought the photocopied driver's licenses with them.
Bluedorn did not end up filing a charge against Bellino that morning, because he felt the evidence presented that morning was insufficient. Bluedorn testified that the quality of the photocopied pictures was "really bad." He testified that Nuckols told him [Bellino] was the culprit. While Bluedorn did not rule out the possibility of charges being brought in the future, at that point he concluded he would need more evidence, in particular, another witness, and declined to charge Bellino. In explaining his decision, Bluedorn testified that Reed was "blind-sided ***, he didn't really see who did it." It is not clear how Bluedorn drew this conclusion, given that Reed could not talk. Reed has consistently maintained that he saw the perpetrator for between five and ten seconds before being hit.
Bluedorn was subsequently removed from the case. During the course of his meeting with Reed and Nuckols, Bluedorn used the word "scab" to describe the replacement drivers. This pejorative term upset Reed or Nuckols, or both of them. Bluedorn testified the word "made someone in the room mad," and agreed that it created "a lot of upset." Bluedorn testified that "probably that day" he got a call from the City Law Director. The law director told Bluedorn that he received a complaint that Bluedorn had called Reed a scab. Bluedorn testified that the law director told him "[d]on't have anything to do with the case anymore. Let [Prosecutor] Stanley [Elkins] handle it from here on in." Thus, Bluedorn testified, he was removed from the case on the basis of a comment he made.
On June 12th, Reed and Jones returned to the Warren City Prosecutor's Office accompanied by James Messenger, an attorney for SBC. Attorney Messenger met with Prosecutor Elkins briefly before taking Reed's complaint. Prosecutor Elkins then separately interviewed Reed and Jones. Attorney Messenger did not sit in on either of these interviews. Afterwards, Prosecutor Elkins prepared a criminal complaint, and Reed signed the complaint. Bellino was charged with felonious assault. Shortly thereafter, Reed returned to his home in Louisiana.
On October 20, 1995, over four months after the incident, a probable cause hearing was conducted in the Warren Municipal Court. Reed, Jones, and Robert Gander (who claimed he had heard Bellino bragging about beating up Reed) testified for the prosecution. All three identified Bellino as the assailant.
For the defense, Detective Sines of the Warren Police Department testified, but did not provide any testimony that was helpful to the defendant. Detective Sines testified that he went to the hospital to do "a short follow-up to advise [Reed] on how to proceed with charges." Detective Sines testified that Reed had previously told a police officer he knew the assailant "by face," and that he knew he was a striking SBC driver, although he did not know the assailant's name. The defense also called Joseph McHenry, a vice-president of SBC, who testified that he was asked by Clifford Nuckols of PSS to provide copies of employees' driver's licenses for the identification of the assailant(s). McHenry was questioned about the process of identifying Bellino and who was involved.
Bellino did not testify in his own defense. He did not present his alibi, although he testified at the trial in this civil case that when he first heard he was a suspect in the assault, which was on June 8th, two days after it occurred, he immediately set about establishing his alibi. In this case, he testified that he went to all the customers he and fellow Teamster, Chris Jennings, had visited on the 6th and took statements from them. But this alibi was not formally presented as a notice of alibi until sometime after Bellino was indicted by the grand jury. It was not presented at the probable cause hearing.
Based on the evidence presented at the preliminary hearing, the Warren Municipal Court found probable cause to bind the matter over to the Trumbull County Court of Common Pleas for submission to a grand jury. Bellino was subsequently indicted.
In the interim period, several things happened. The strike was resolved in August, and the Teamsters returned to work at SBC. Reed had left the area in June and returned on October 20th, only for the purpose of testifying at the preliminary hearing. On October 20th, immediately preceding Bellino's preliminary hearing, Richard Wilding pled to menacing Jones. He did not, however, inform either the police or the prosecutor that Bellino was innocent. Nor did he testify at Bellino's preliminary hearing. Wilding testified at the trial in the present matter that after the strike ended he informed someone at SBC that Bellino did not do it.
Shortly after Bellino was initially arrested in June, the actual perpetrator of the assault on Reed, John Torella, approached Bellino and, in a manner, apologized to Bellino for the trouble Bellino was experiencing. Apparently, Torella indicated to Bellino that if Bellino was formally indicted, then Torella would "do something about it," as in, come forward and take responsibility. But he never did.
Also, shortly after the incident, Torella confided to the Union Shop Steward, William Hudak, that he was the one who assaulted Reed. Hudak happened to be a brother-in-law of Bellino. After Bellino was formerly indicted, Hudak pressured Torella to come forward, but Torella would not. Hudak testified that it was common knowledge amongst the Teamsters that Bellino was innocent. Hudak testified that, after the strike ended, he told Walter Kohowski, SBC's Vice President of Operations, that Bellino was innocent, although he did not tell Kohowski about Torella. Hudak further testified that, in April of 1996, Kohowski told him he (Kohowski) knew Bellino did not do it, that "they" (SBC) knew who did do it, but that the charges against Bellino would not "go away" unless the guilty party came forward. Ultimately, after meeting with Bellino and his attorneys, Hudak agreed to wear a wire provided by a private detective agency and record Torella admitting the crime. This was accomplished in July of 1996. The tape was turned over to the prosecutor, and the prosecutor filed a motion for nolle prosequi, which was granted on August 21, 1996.
Bellino filed his suit for malicious prosecution. The following people testified at the trial: Officer Calloway of the Warren Police Department, who took Reed's initial statement in the hospital; Captain Evans of the Warren Police Department, who wrote a letter, which was admitted in evidence, that stated "[Warren P.D.] were aware that officials of Superior Beverage did conduct an inquiry and did file charges against *** Joe Bellino."; Detective Sines of the Warren Police Department; Robert Jennings, Bellino's alibi witness; Richard Wilding, the Teamster who menaced Jones; William Hudak, the Union Shop Steward; Robert Gandor, CSS employee and witness at the preliminary hearing, by deposition read into the record; Paul Jones, the driver with Reed on the day of the incident, by deposition read into the record; Curtis Reed, the victim of the assault and defendant in the suit, by deposition read into the record; James Messenger, attorney for SBC; Samuel Bluedorn, former Warren City Prosecutor; Kathleen Bellino, wife of Bellino; Bellino; Joseph McHenry, SBC's Executive Vice-President; and, Walter Kohowski, SBC's Vice-President of Operations.
After the close of evidence, the trial court partially directed the verdict. The court, based on the fact that Reed left the state of Ohio shortly after the incident, and returned only for the probable cause hearing, determined that Reed could have no liability for the "continuation" of the prosecution of Bellino after the probable cause hearing on October 20, 1995. The court found that no evidence was presented indicating he had any awareness of new relevant facts after that point in time. The court also concluded that, because Reed was the complainant, SBC's liability was vicarious only. The court apparently concluded that if Reed did not have continuing liability after the preliminary hearing, that SBC did not either, as its liability was based on Reed's. This decision manifested itself in the jury instruction. The first element of the malicious prosecution tort is "malice in instituting or continuing the prosecution." (Emphasis added.) Trussell v. GeneralMotors Corp. (1990), 53 Ohio St.3d 142, syllabus. In its instruction, the court changed the first element to "the malicious filing of a prior case against the plaintiff by the defendant." The instruction omitted the word "continuing." The court did not explain its decision, or this limitation, in any other way.
In a finding relevant to the issue of punitive damages, which requires a showing of actual malice, the court found that no evidence had been presented establishing "malice in fact" on the part of the appellants, by which the court meant there was no evidence presented establishing hatred, ill will, or a spirit of revenge. Consequently, the court gave the alternative instruction for actual malice (which allows for actual malice to be inferred) found in OJI 23.70(5)(B), instructing that "[a]ctual malice is a conscious disregard for the right and safety of other persons. It has a great probability of causing substantial harm."
The jury returned a verdict in favor of Bellino, awarding $8,125 in compensatory damages and $150,000 in punitive damages. Both Reed and SBC filed motions for judgment notwithstanding the verdict pursuant to Civ.R. 50. SBC also, in the alternative, filed a motion for a new trial pursuant to Civ.R. 59. The motions were denied, and SBC timely filed its appeal, assigning the following errors:
 "(1) The trial court erred by denying Superior's motion for JNOV and, in the alternative, for a new trial.
 "(2) The trial court erred by denying Superior's motion for a new trial because it improperly admitted false hearsay statements that directly established elements of Bellino's malicious prosecution claim.
 "(3) The trial court further erred by submitting punitive damages to the jury."
 Reed also timely filed an appeal, assigning the following error:
 "The trial court committed error when it denied [Reed's] motion for judgment notwithstanding the verdict because there was no evidence in the record that Curtis Reed's actions amounted to `malice in fact.'"
 With respect to SBC's first assignment of error, an appellate court's review of a trial court's disposition of a motion for judgment notwithstanding the verdict is de novo. Felden v. Ashland Chem. Co., Inc. (1993), 91 Ohio App.3d 48. A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence, presenting a question of law for review. O'Day v. Webb (1972), 29 Ohio St.2d 215. The appellate court must construe the evidence most strongly in the favor of the non-moving party and determine whether reasonable minds could only conclude that the moving party was entitled to judgment as a matter of law. If reasonable minds could only conclude that the plaintiff failed to meet his burden on one essential element, then the moving party is entitled to judgment as a matter of law. In addressing the analogous legal analysis that occurs when addressing a motion for a directed verdict, the Supreme Court of Ohio has stated:
 "[I]f all the evidence relating to an essential issue is sufficient to permit only a conclusion by reasonable minds against a party, after construing the evidence most favorably to that party, it is the duty of the trial court to *** direct a verdict on that issue against that party. Naturally, if the finding on that one issue disposes of the whole case, a duty arises to grant judgment, upon the whole case." (Citations omitted.) Huber v. O'Neill (1981), 66 Ohio St.2d 28, 29.
 We believe SBC's arguments with respect to the trial court's failure to grant a judgment notwithstanding the verdict are dispositive of this appeal.
SBC argues that Bellino failed to establish the elements of malicious prosecution. "The elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. ***." Trussell, 53 Ohio St.3d 142 at syllabus. "In an action for malicious prosecution, the want of probable cause is the gist of the action." Huber, 66 Ohio St.2d at 29, citing Melanowski v. Judy (1921),102 Ohio St. 153, paragraph one of the syllabus. Probable cause is "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense." Baryack v. Kirkland (2000),137 Ohio App.3d 704, 710-711; Ash v. Marlow (1851), 20 Ohio 119, paragraph one of the syllabus.
For purposes of a malicious prosecution lawsuit, a legal presumption that probable cause existed arises where a tribunal issues a bind over or an indictment, unless there was perjured testimony or another significant irregularity in the proceeding. Uroseva v. Lerakis (July 10, 1992), Trumbull App. No. 91-T-4602, unreported, 1992 Ohio App. LEXIS 3665, at *6. In this case, the presumption was established, as the Warren Municipal Court bound Bellino over and a grand jury indicted him. There was no evidence of perjury or other significant irregularity in the proceeding sufficient to dispose of this presumption prior to trial. SBC argues that Bellino failed at trial to present any evidence to rebut the presumption that probable cause existed to initiate the criminal proceedings.
When contemplating this presumption, it must be understood that the presumption applies to the time when the charges were filed. "In determining the want of probable cause, the defendant's conduct should be weighed in view of his situation and of the facts and circumstances which he knew or was reasonably chargeable with knowing at the time he made the criminal complaint." Huber v. O'Neill, 66 Ohio St.2d at 29-30 citingMelanowski v. Judy, 102 Ohio St. 153, paragraph two of the syllabus. The plaintiff in a malicious prosecution suit, when confronted with this presumption, must produce facts demonstrating that reasonable grounds of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense, did not exist at the time charges were filed. Contrary to Bellino's arguments, the presumption does not evaporate when the defendant is subsequently exonerated, because, in all malicious prosecution cases, the defendant was exonerated. The quantum of proof for probable cause is significantly less than the proof beyond a reasonable doubt required for conviction. Thus, it is totally possible to have probable cause but no conviction. A plaintiff must bring forward substantial evidence to rebut this presumption. Deoma v. Shaker Heights
(1990), 68 Ohio App.3d 72, 77; Donahoe v. Burd (S.D.Ohio 1989),722 F. Supp. 1507, 1517.
At the outset of our analysis, we note that, in its partially directed verdict, the trial court ruled that the liability of SBC was vicarious to Reed. Under this ruling, only to the extent Reed was liable could SBC be held liable. In its partially directed verdict, the trial court also determined that Reed had no continuing liability after the probable cause hearing ended on November 2, 1995, due to the fact Reed lived out of state and was not chargeable with any knowledge of developments after the probable cause hearing. Thus, if liability is warranted, it can only be based on Reed's actions taken in initiating the prosecution, up to November 2, 1995.
As Reed was the person who brought the complaint, and SBC's liability is vicarious to him, the focus of the probable cause analysis must be on Reed. In terms of rebutting the presumption that Reed had probable cause to bring the complaint, Bellino presented little evidence that might potentially demonstrate the lack of probable cause in the relevant time frame. In order to evaluate what evidence was presented on this issue, it is necessary to review the entirety of the testimony relevant to this issue.
Officer Calloway of the Warren Police Department testified at trial. He was the first officer to speak with Reed. The substance of his testimony was that Reed indicated to him that Reed could identify the assailant, that he recognized the assailant as a striking worker from SBC. Officer Calloway did testify that, in his opinion, the photocopied driver's licenses were of poor quality and, thus, not a good way to identify a defendant. Captain Evans of the Warren Police Department was the next officer to testify. He did not provide any testimony as to what occurred in relevant time frame on the probable cause issue. He does not know Reed and never saw or spoke to Reed. He had no participation in the identification process. Captain Evans did testify that he saw the pictures that were used to identify Bellino, and that those were "blown up" and not the same as those presented in evidence by Bellino at trial.
The third officer to testify was Detective Sines. The detective visited Reed at the hospital one time, the day after the incident. Detective Sines testified Reed stated he knew who assaulted him, in the sense he knew the assailant was an SBC driver, although Reed did not know the assailant's name. Reed told him Jones could also identify the assailant, but the detective never spoke to Jones. Detective Sines told Reed that he and Jones should look at company photos in order to determine the assailant's name and then take the complaint to the prosecutor's office. The detective testified that when he told Reed to look at company pictures, he did not envision that the company pictures would be photocopies of driver's licenses.
The next person to testify was Robert Jennings, Bellino's alibi witness. Jennings testified that he spoke to Walt Kohowski, an executive of SBC's, in either September or October, prior to the probable cause hearing. Jennings told Kohowski that Bellino did not assault Reed, and that he did not know who did. Jennings never spoke to Reed, did not testify the information he gave to Kohowski was conveyed to Reed, nor spoke to the police or the prosecutor prior to the probable cause hearing.
Richard Wilding, who was convicted of menacing Jones, testified next. He stated that the group he was with ran Jones off from the truck and were leaving when Reed came out of the building and assaulted them. Wilding said Jones had run off and could not have seen anything. He testified that he told an SBC manager that Bellino was innocent, but he could not remember which manager, nor did he specify when this information was conveyed, except that it was after the strike. Wilding never conveyed any information to anyone in law enforcement, nor did he ever speak to Reed.
Wilding was scheduled for a preliminary hearing in the same court, on the same morning, as Bellino. Thus, although Wilding was scheduled to go first, they were in court at the same time. Wilding opted to plead no contest to his charge and, when his case was through, Bellino's preliminary hearing began. Wilding testified that both Reed and Jones were present in the courtroom while his case was being handled. Wilding did not remain to testify on Bellino's behalf at Bellino's preliminary hearing, even though he knew Bellino was innocent. It is noteworthy that Wilding was identified by the same method, the photocopied licenses, as was Bellino. Thus, immediately prior to the beginning of Bellino's hearing, Reed had a strong indication that the method used in identifying the culprits was reasonable, in that it successfully identified Wilding. The fact that Bellino maintained a not guilty plea was, in terms of criminal law, completely unremarkable.
William Hudak was the next person to testify. With respect to the probable cause issue as it relates to Reed, he testified that he approached Walter Kohowski after the strike and told him that Bellino did not commit the assault. Hudak testified that Kohowski told him if Bellino did not do it, then he needed to get the person who did do it to come forward. There was no testimony indicating this information was conveyed to Reed, or to the prosecutor, although the following summer, when Hudak successfully taped Torella admitting he had committed the assault, this was conveyed directly to the prosecutor, not to SBC.
The testimony that Robert Gander, Paul Jones, and Curtis Reed gave at the preliminary hearing was then read to the jury. Gander, who was a security guard hired to help protect the replacement workers, testified that on the day of the incident, he overheard Bellino bragging about assaulting Reed. There is nothing inherent in this testimony that would tend to indicate to Reed that he may have identified the wrong person, in fact, this testimony would tend to indicate Reed had reasonable grounds for suspicion and enhance the belief that Bellino was guilty of the offense.
Paul Jones testified that he saw Bellino hit Reed and that there was no doubt in his mind that Bellino had done it. When he returned to SBC's location on the day of the incident, he recognized Bellino, who was standing on the picket line, as the assailant before he looked at the photocopied licenses to determine his name. Jones also identified Wilding, whom he had never seen before the day of the incident, by using the photocopied license pictures. Jones testified he was asked to look at the pictures for the purpose of identifying the other men who were with Bellino, and not just to identify Bellino, whom he had already identified on the picket line.
Reed testified at the preliminary hearing that he saw Bellino and was able to identify him. He testified he returned to the hotel he was staying at during the strike the day after the incident. He was shown approximately twenty-five photocopied pictures and picked out Wilding and Bellino. Reed testified he left town and returned to New Orleans, Louisiana, shortly after the incident and returned to Ohio only for the preliminary hearing. There was no testimony that he had participated in any discussions with the SBC manager(s), whom had been approached by Jennings, Wilding and Hudak, and whom were told that Bellino was innocent.
Next, the testimony Reed gave in a deposition by telephone, conducted almost four years after the incident, was read to the jury. Reed testified he saw Bellino's face for between five and ten seconds immediately before he was assaulted. He testified he was shown the photocopied pictures by Clifford Nuckols of CSS. He testified he was not given any instructions on how to view the pictures, had no discussions related to identification, and was not aware that Jones had identified Bellino and Wilding. He testified he viewed a videotape of strikers on the picket line after the assault, in which Bellino could be overheard saying "you should have watched that nigger fall." He testified that it was his decision to proceed with the prosecution of Bellino.
Attorney James Messenger testified next. He was SBC's attorney during the course of the strike and handled many, if not all, legal matters for SBC related to the strike. He testified that he became involved after receiving a call from Cliff Nuckols, a PSS manager, stating that a Warren City Prosecutor had declined to file charges for Reed because Reed was a "scab," and the prosecutor did not want to get involved in the dispute. Messenger, who was familiar with the other Warren City Prosecutor, contacted him and arranged for Reed's complaint to be heard again. An appointment was made. Messenger testified he had nothing to do with the identification process. In fact, he was not involved until after the identifications had been made and testified that his only role was to facilitate the complaint being heard.
Warren City Prosecutor Bluedorn testified next. He took Reed's complaint in the first instance, and declined, under the circumstances, to file charges. Reed was unable to talk at this meeting due to his jaw being wired shut. Cliff Nuckols of PSS accompanied Reed and spoke for him. Jones, the other eyewitness, was not present. Bluedorn testified he understood Nuckols to say Reed was "blindsided." Bluedorn testified he consequently concluded Reed never saw his assailant, and could not identify him. Bluedorn informed them they needed a witness. Bluedorn also testified the photocopied licenses were, for identification purposes, of poor quality. Bluedorn testified that he did not file charges because Nuckols was not a witness, Reed could not talk, and he did not think Reed could identify the assailant. Bluedorn testified the photocopied picture would have been acceptable if they had a good witness. He also testified he did not rule out the possibility of charges, rather, he felt the evidence presented to him in that meeting was insufficient. He testified it would have been his procedure to advise Reed he needed to bring another witness in. Bluedorn was subsequently told by his boss to let Prosecutor Elkins handle the case due to Bluedorn's "scab" remark.
Cliff Nuckols, a PSS manager, testified next. Regarding the issue of whether Reed had probable cause to pursue charges against Bellino, the only relevant testimony Nuckols provided related to the photocopied license pictures. Nuckols testified he was asked to get pictures of the drivers on strike, that he was given copies, and that he subsequently provided these to Reed and Jones for identification purposes. He testified he did not assist in the identification process in any other way.
Bellino testified that after he was charged, on the advice of counsel, he did not discuss the situation with anyone. He put together his alibi shortly after the incident, but this was not presented at the preliminary hearing. He testified that he attended a meeting between management and the strikers that was held on June 9, 1995, three days after the incident. He testified that at that meeting he told the president of SBC he had not been involved in any violence. He never spoke with Reed. Although no time frame was indicated, he stated that at some point Walt Kohowski, an SBC manager, told him he, Kohowski, knew Bellino did not commit the assault. Bellino testified he told Kohowski he did not wish to discuss the case.
The next person to testify was Joseph McHenry, an SBC manager. He became aware of the assault shortly after it happened and provided Nuckols with the photocopied pictures used in identification. He stated he made no judgment as to their clarity and did not consider whether photos were a "reasonable" way to identify someone, rather, he simply provided them. McHenry contacted Attorney Messenger, after Nuckols complained to him about how the first prosecutor handled the matter, and informed Messenger that Nuckols would contact him. McHenry testified that, at some point, he became aware of the "rumor" that Bellino innocent. However, he felt the matter was being handled by the proper authorities and did not contact anyone in that regard.
The last person to testify was Walt Kohowski. Kohowski testified he was not present when either Reed or Jones made their identifications of Bellino. He was aware that CSS was constantly taking video of the striking workers, but he was not aware of how the video was used. Kohowski had no recollection of being told by anyone, including Hudak, that Bellino was innocent prior to the preliminary hearing, nor did he recollect telling Hudak that Hudak should tell him who the guilty party was. He testified he was not involved in the identification, nor did he ever contact Reed prior to the preliminary hearing to convey what others alleged he was told, that Bellino was innocent.
At the conclusion of the evidence, in addressing the motions for a directed verdict, the trial court concluded that no evidence had been presented establishing malice in fact. Nevertheless, under the law, malice could be inferred by the absence of probable cause. Melanowski, at paragraph one of the syllabus; Sikora v. Gibbs (1999),132 Ohio App.3d 770, 778. As previously stated, Bellino, as plaintiff, needed to present substantial evidence to overcome the presumption that Reed had probable cause to bring the charges.
Upon reviewing the totality of the evidence presented, we conclude, as a matter of law, that Bellino failed to present substantial evidence to rebut the presumption. Reed's reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense, was formed from the start of the incident till the charges were filed and he left town. He did not return until the preliminary hearing. There was no evidence presented that Reed received any information in the interim period to cause him to question the basis of his belief Bellino was the assailant. Immediately prior to Bellino's preliminary hearing, Wilding, whose name was established by the same method as Bellino's, pled to his charge. This would tend to enhance the belief that the suspicion was supported by sufficiently strong evidence.
The evidence established that Reed followed the procedure he was told to follow by the police. He was told to use company pictures to establish the name, to get a witness, and to take his complaint to the prosecutor's office. In the final analysis, the only evidence presented by Bellino that Reed's belief Bellino was guilty was unreasonable was the use of the photocopied licenses to establish his identity. Even Prosecutor Bluedorn, who would not proffer charges after his meeting, indicated the photocopies would be an acceptable means of identifying the culprit if a witness was procured. One was, Jones. In sum, we conclude, Bellino failed to present substantial evidence to rebut the presumption that Reed had probable cause. Therefore, the presumption stands and Bellino's case fails on a material element. Consequently, his case fails as a matter of law, and the trial court should have granted the motion for judgment notwithstanding the verdict.
SBC's first assignment of error has merit. The judgment of the trial court is reversed and judgment is entered for appellants, SBC and Reed. All other assignments of error are moot.
PRESIDING JUDGE WILLIAM M. O'NEILL, CHRISTLEY, J., GRENDELL, J., concur.